Argued and submitted June 27, 2006, order of circuit court
affirmed August 23, 2007

## STATE OF OREGON,
### *Appellant,*

*v.*

## SCOTT NOLAN SCOTT,
### *Respondent.*

## (CC 061075; SC S54482)

166 P3d 528

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jamesa J. Drake, Deputy Public Defender, Salem, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This is a state's appeal challenging a pretrial order suppressing statements that defendant made during a custodial interview.[1] The issue presented to this court is whether, during that interview, the police violated defendant's right against self-incrimination and his derivative right to counsel under Article I, section 12, of the Oregon Constitution. For the reasons that follow, we hold that the police violated defendant's state constitutional right against self-incrimination and the right to counsel. We therefore affirm the trial court's suppression order.

Defendant is charged with the murder of Ronald James Overstreet (victim) in March 2006. The relevant events leading up to and during that interview occurred as follows.

Defendant was arrested by Scappoose police officers in connection with the Overstreet homicide. Shortly after the arrest, St. Helens Police Officer Edwards took defendant into custody and transported him to the St. Helens police station. At that time, the arresting officers informed Edwards that defendant had been advised of, and had responded that he understood, his *Miranda* rights. A second St. Helens Police Officer, Keller, joined Edwards at the station. The two officers escorted defendant to an interview room, where the following exchange occurred between Keller and defendant.

"[KELLER]: Hey, Scott.

"[DEFENDANT]: (unintelligible).

"[KELLER]: I'm going to turn on the tape recorder all right? So, our conversation will be recorded.

"[DEFENDANT]: Uhm, may I have a lawyer present?

---

[1] ORS 138.060(2)(a) provides, in part:

"[W]hen the state chooses to appeal from an order listed in paragraph (a) or (b) of this subsection, the state shall take the appeal from the circuit court to the Supreme Court if the defendant is charged with murder or aggravated murder. The orders to which this subsection applies are:

"(a) An order made prior to trial suppressing evidence[.]"

"[KELLER]: Hey Scott, I'm sorry[,] what was that you said?

"[DEFENDANT]: I would, I would appreciate a lawyer present before I say anymore to you guys.

"[KELLER]: 'kay

"[DEFENDANT]: I'd like to get one here.

"[KELLER]: I . . . I . . . well . . . um . . . let me go ahead and read you this. All right? You do have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present for you while you're being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, if you wish. Do you understand each of these rights as I have explained them to you?

"[DEFENDANT]: Yes, sir.

"[KELLER]: Okay, do you have any questions about those?

"[DEFENDANT]: No, sir.

"[KELLER]: Okay, and you just told me that . . . ah . . . you wanted to have a lawyer here is that right?

"[DEFENDANT]: It would be nice.

"[KELLER]: That would be nice.

"[DEFENDANT]: Seeing what I've seen on TV * * * I might need one.

"[KELLER]: You saw something on TV?

"[DEFENDANT]: Big picture of me, saying that * * * I killed somebody.[2]

"[KELLER]: Saying that you killed somebody, huh? 'kay . . . all right . . . um . . . Was there a particular lawyer you had in mind?

"[DEFENDANT]: I just want one here.

"[KELLER]: You just want one here. Do you have one that you've talked with in the past?

---

² The television broadcast to which defendant referred was a news broadcast identifying him as a suspect in the victim's murder.

"[DEFENDANT]: I don't care about a lawyer. I'm [expletive] either way. I'll talk to my lawyer when I get to court. Ask me what you're going to ask me.

"[KELLER]: Okay, well, that's . . . that's . . . that's entirely up to you. You want to talk to us then, Scott?

"[DEFENDANT]: Yes, sir."

Defendant filed a pretrial motion to suppress the inculpatory statements that he had made during and after the foregoing exchange, citing both the state and federal constitutions. The trial court initially denied that motion. It determined that (1) defendant had made an unequivocal request for counsel; (2) Keller's questions subsequent to that request were constitutionally permissible because they were aimed at soliciting defendant's preference for an attorney; and (3) defendant had executed a voluntary, knowing, and intelligent waiver of his right to counsel. On reconsideration, however, the trial court reversed its prior ruling, construing the Court of Appeals decision in *State v. Dahlen*, 209 Or App 110, 146 P3d 359 (2006), as holding that police officers are forbidden from inquiring into a defendant's preference for an attorney after the defendant unequivocally has invoked the right to counsel.[3] In accord with its understanding of *Dahlen*, the trial court entered a second order suppressing defendant's inculpatory statements. The state appeals from that order.[4]

The parties present specific arguments regarding interrogation and waiver to address the issue whether the police violated defendant's constitutional right against self-incrimination and his derivative right to counsel during the custodial interview. As noted, the trial court resolved that issue in defendant's favor and ordered defendant's statements suppressed. We review the legal conclusions underlying the trial court's ruling as a matter of law. *See State v.*

---

[3] Although the trial court initially determined that defendant had waived his right to counsel subsequent to his unequivocal request, the court did not analyze waiver on reconsideration.

[4] As a threshold matter, defendant reiterates certain jurisdictional arguments that he raised at earlier stages of these proceedings. We previously considered defendant's jurisdictional arguments when we denied defendant's motion to dismiss the state's appeal, and we adhere to that ruling.

*Acremant*, 338 Or 302, 321-22, 108 P3d 1139 (2005) (identifying issues whether police interrogated suspect and whether suspect waived right to counsel as matters of law). Although the constitutional rights involved arise under both Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, we consider the issues first under the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 261, 264-65, 666 P2d 1316 (1983) (describing constitutional methodology).

■     Article I, section 12, provides, in part:

"No person shall * * * be compelled in any criminal prosecution to testify against himself."

The right against self-incrimination includes a derivative right to counsel during custodial interrogation. This court has described the relationship between, and the importance of, those rights in multiple cases over the past three decades.

"Article I, section 12, protects against compelled self-incrimination in criminal prosecutions. That protection extends to custodial interrogations, because of the inherent level of coercion that exists in such interrogations. Further, Article I, section 12, provides a derivative right to the assistance of counsel during custodial interrogation, because 'a lawyer's presence at a custodial interrogation is one way to ensure the right to be free from compelled self-incrimination.'"

*State v. Joslin*, 332 Or 373, 380, 29 P3d 1112 (2001) (internal citation omitted) (quoting *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998)); *see also State v. Haynes*, 288 Or 59, 71, 602 P2d 272 (1979) ("[T]he issue of a suspect's access to counsel enters cases like the present as an aspect of [the suspect's] right to answer questions or provide incriminating testimony only voluntarily. * * *. [I]t is not a generalized right to counsel that the decisions * * * enforce but, more concretely, the derivative right to the benefit of counsel's efforts to forestall involuntary and incriminating disclosures.").

■     Three points must be addressed in determining whether the police have violated a suspect's right against self-incrimination and the right to counsel in cases such as this one: (1) whether the suspect was subject to custodial

interrogation; (2) whether the suspect invoked the right to counsel in an equivocal or an unequivocal manner; and (3) in some cases, whether the suspect waived a prior invocation of the right to counsel. *See, e.g., Acremant,* 338 Or at 321-22 (demonstrating inquiry). Before turning to the first of those substantive issues, which presents the crux of the issue in this case, we reiterate one important constitutional rule regarding unequivocal requests for counsel.

■       The state does not dispute that defendant unequivocally requested counsel in this case. At a minimum, two of defendant's invocations at the beginning of his exchange with Keller bear out the state's concession: "I would appreciate a lawyer present before I say anymore to you guys. * * *. I'd like to get one here." Article I, section 12, requires that police officers respond to unequivocal requests for counsel in a different manner than to equivocal requests. *See State v. James,* 339 Or 476, 480 n 2, 123 P3d 251 (2005) (describing constitutional responses); *Meade,* 327 Or at 339-40 (same); *State v. Charboneau,* 323 Or 38, 54, 913 P2d 308 (1996) (same). In the former circumstance, the constitutional rule is plain: "[W]hen a suspect is in police custody and makes an unequivocal request to speak to a lawyer, all police interrogation of that suspect must cease." *Charboneau,* 323 Or at 54.

That said, we now turn to the issue on which the disposition of this case turns: whether defendant, having invoked his right to the assistance of counsel, was nevertheless subject to continued "interrogation" in violation of Article I, section 12.

■       The state constitutional right against self-incrimination and the derivative right to counsel adhere when a suspect is subject to custodial interrogation. *See, e.g., Joslin,* 332 Or at 380 (so explaining). Separate inquiries extend from each of those terms. Here, there is no dispute that defendant was in custody during his interview at the St. Helens police station.[5] Instead, the contested issue is whether the questions that Keller posed subsequent to defendant's unequivocal request for counsel constituted interrogation for purposes of our analysis under Article I, section 12.

_____

[5] This court has explained that the determination whether a defendant was "in custody" at the time that a request for counsel was made hinges on the extent to

The parties' arguments are straightforward. The state focuses primarily on Keller's questions regarding defendant's preference for an attorney: "Was there a particular lawyer you had in mind? * * *. Do you have one that you've talked with in the past?" The state contends that those questions did not constitute interrogation because they were not questions that police officers should know were reasonably likely to elicit incriminating responses from a suspect. Defendant counters by focusing primarily on Keller's questions regarding what defendant had seen on television: "You saw something on TV? * * *. Saying that you killed somebody, huh?" Keller then paused for eight to ten seconds before asking defendant, "Was there a particular lawyer you had in mind?" Ultimately, defendant contends that the questions regarding what defendant had seen on television constituted interrogation because Keller should have known that they were reasonably likely to elicit an incriminating response.

The parties tailor their "interrogation" arguments to the definition that the United States Supreme Court announced under the Fifth Amendment to the United States Constitution in *Rhode Island v. Innis*, 446 US 291, 301, 301 n 5, 100 S Ct 1682, 64 L Ed 297 (1980):

> "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[5] from the suspect. * * *. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect * * * amounts to interrogation.

> "[5] By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial."

(Emphasis in original.) The parties thus implicitly invite this court to adopt the *Innis* definition of interrogation as part of our analysis under Article I, section 12.

which the defendant was "free to leave" the alleged custodial setting. *See, e.g., State v. Terry*, 333 Or 163, 172, 37 P3d 157 (2001) (so stating).

This court has emphasized that the constitutional protections afforded to suspects and criminal defendants set out in the Oregon Constitution require an analysis independent of similar protections set out in the United States Constitution. *See, e.g., State v. Caraher*, 293 Or 741, 748, 653 P2d 942 (1982) (stating principle). Here, however, the question does not concern the construction of any term set out in Article I, section 12; instead, our task involves defining a familiar term—"interrogation"—that both this court and the United States Supreme Court repeatedly have used to delineate situations in which *Miranda*-type warnings are required or *Miranda*-type rights are implicated under either the state or federal constitutions. *See Charboneau*, 323 Or at 54-55 (discussing interrogation of suspect under Article I, section 12, when defendant had waived his *Miranda* rights); *State v. Magee*, 304 Or 261, 266, 744 P2d 240 (1987) (concluding that Article I, section 12, provides independent source for requirement of warnings similar to *Miranda*); *Innis*, 446 US at 301 (defining interrogation in context of *Miranda* requirements). Additionally, neither party contends, in the context of each one's arguments in this case, that the concept of interrogation carries any meaning different from the one that the United States Supreme Court articulated in *Innis*. In view of those considerations, we shall apply the Court's definition of the term interrogation, for purposes of *Miranda*'s Fifth Amendment requirements, to our analysis of defendant's Article I, section 12, rights at issue here.

■    As noted, *Innis* explained that interrogation extends to the type of police conduct that the police "should know [is] reasonably likely to elicit an incriminating response"; "incriminating response," in turn, means any inculpatory or exculpatory response that the prosecution later may seek to introduce at trial. 446 US at 301, 301 n 5. To determine whether, in this case, interrogation occurred under the *Innis* definition, we consider both the substance of the questions posed to defendant and the manner in which those questions were asked. We agree with defendant that that analysis turns on Keller's decision to discuss what defendant had seen on television. Defendant's culpability for the shooting was the very subject of the television broadcast at which those

questions were aimed; any further discussion of that broadcast would serve only to prolong a discussion that defendant had tried to terminate and, indeed, would be reasonably likely to elicit some type of incriminating response from defendant. That conclusion is bolstered by Keller's eight to ten-second pause after asking the second question—"Saying that you killed somebody, huh?"—which gave defendant an invitation, and an opportunity, to provide an incriminating response. Based upon those considerations, we conclude that the questions that Keller posed subsequent to defendant's unequivocal request for counsel constituted proscribed interrogation for purposes of Article I, section 12.[6]

■     The fact that Keller later posed questions regarding defendant's preference for an attorney does not change the analysis. In some circumstances, a constitutional violation may not result from a police officer's attempt to determine whether a suspect who unequivocally has requested counsel prefers a particular attorney. Police officers may pose such questions in a manner that is not reasonably likely to elicit an incriminating response. However, that hypothetical scenario is not presented here. Keller's questions regarding defendant's preference for a particular attorney were interspersed with, and successive to, his questions regarding defendant's exposure to the television broadcast identifying him as a murder suspect. The unconstitutionality of the latter questions is not somehow redeemed by the existence of the former ones.

We hold that defendant was subject to custodial interrogation during the interview at the St. Helens Police Station, such that his constitutional protection against self-incrimination and his derivative right to counsel applied. Under Article I, section 12, the police were required to cease interrogation upon defendant's unequivocal request for counsel. They did not. Because the police obtained defendant's

---

[6] Defendant argues that Keller's readministration of *Miranda* warnings after defendant had invoked his right to counsel also violated his constitutional rights. *See Smith v. Illinois*, 469 US 91, 93, 105 S Ct 490, 83 L Ed 2d 488 (1984) (disapproving readministration of *Miranda* warnings after suspect invoked right to counsel). Because the resolution of that issue is not necessary to our decision in this case, we do not express any opinion about the legal significance of the readministration of *Miranda* warnings that occurred here.

statements in violation of Article I, section 12, those statements must be suppressed.

The order of the circuit court is affirmed.